Michael **LAMPE** and Carolyn Lampe, Individually and as Next Friends of Rachael Lampe, a minor, Petitioners,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
Respondent.

No. 90–3337V.

United States Court of Federal Claims.

Dec. 17, 1998.

**634**

Craig Lewis, Gallagher, Lewis & Downey, Houston, TX, attorney of record for petitioners.

Claudia Barnes Gangi, Torts Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were Gerard W. Fischer, Assistant Director, John Lodge Euler, Deputy Director, Helene M. Goldberg, Director, and Frank W. Hunger, Assistant Attorney General, attorneys of record for defendant.

## ORDER

HORN, Judge.

The petitioners Michael Lampe and Carolyn Lampe, acting on behalf of their daughter Rachael Lampe, filed a petition under the National Vaccine Injury Compensation Act, 42 U.S.C. §§ 300aa–1 to 300aa–34 (1994) (Vaccine Act),[1] seeking

---

1. Tit. XXI, § 2112, as added Nov. 14, 1986, Pub.L. No. 99–660, tit. III, § 311(a), 100 Stat. 3761; Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224 and amended Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224, Pub.L. No. 100–203, tit. IV, §§ 4307(3)(c), 4308, as amended and added July 1, 1988, Pub.L. No. 100–360, tit. IV, § 411(*o*)(2), (3)(A), 102 Stat. 808; Dec. 19, 1989, Pub.L. No. 101–239, tit. VI, § 6601(d)-(i), 103 Stat. 2286–2290; Nov. 3, 1990, Pub.L. No. 101–502, § 5(b), 104 Stat. 1286; Nov. 26, 1991, Pub.L. 102–168, tit. II, § 201, 105 Stat. 1102; Oct. 27, 1992, Pub.L. 102–531, tit. III, § 314, 106 Stat. 3508; Oct. 29, 1992, Pub.L. 102–572, tit. IX, §§ 902(b)(1), 911, 106 Stat. 4516; June 10, 1993, Pub.L. 103–43, tit. XX,

on-table[2] compensation for an encephalopathy [3] allegedly sustained by Rachael Lampe. Petitioners allege alternatively that Rachael Lampe suffered injuries, in the form of her residual seizure disorder and subsequent mental retardation after her diphtheria-pertussis-tetanus (DPT) vaccinations on December 18, 1975 and January 19, 1976. Furthermore, in the alternative petitioners allege that the January 19, 1976, DPT vaccination significantly aggravated Rachael's condition or injury which manifested after the earlier DPT vaccination. The Chief Special Master for the United States Court of Federal Claims denied each of the claims in an unpublished opinion, *Lampe v. Sec'y DHHS*, No. 90–3337V (Fed.Cl. June 4, 1998).[4]

Petitioners then filed a motion for review with this court pursuant to Appendix J, paragraph 26 of the Rules of the United States Court of Federal Claims (RCFC). Specifically, petitioners allege that they have proved by a preponderance of the evidence causation in fact that the DPT vaccinations were the reason for Rachael's injury. Petitioners argue that the Chief Special Master's finding that Rachael's "bicycle pedaling movements as a pre-existing seizure condition," which then limited the inquiry regarding the last DPT vaccination to only whether the vaccination caused significant aggravation of a preexisting condition, was not proper. The petitioners argue that the determination of a "preexisting condition" as found by the Chief Special Master is not "authorized by the Vaccine Act" because the bicycle pedaling movements occurred after the DPT vaccinations began, but before the last DPT vaccination. Moreover, the petitioners argue, once the Chief Special Master found a preexisting condition, he failed to act in accordance with the law on significant aggravation as set forth in the Vaccine Act and enunciated in *Whitecotton v. Secretary of Health & Human Services*, 81 F.3d 1099 (Fed.Cir.1996), by not focusing on Rachael's "*current condition*, at the time of the hearing, years after the DPT vaccinations" as opposed to the Chief Special Master's factual determination that any worsening of Rachael's condition was not until at least five months after the last DPT vaccination.

Rachael Lampe was developing normally and meeting her developmental milestones prior to her first vaccination. On November 10, 1975, December 18, 1975, and January 19, 1976, DPT vaccinations were administered to the child. Each of the vaccinations are listed in the physician's "Subsequent Visits and Findings" notes, but these records make no mention of any problems, including no mention of pedaling movements, crying, fever or swelling. On January 26, 1976, Rachael experienced a grand mal seizure that lasted approximately twenty to twenty-five minutes. The pediatric neurologist noted that: "On the day after admission Mrs. Lampe mentioned the fact that Rachael had actually had intermittent brie[f] episodes of rhythmic jerking of the right foot for the past month, and therefore most likely her current episode did not therefore represent a new acute situation."

§ 2012, 107 Stat. 312; Aug. 10, 1993, Pub.L. 103–66, tit. IV, § 13632, 107 Stat. 312; Dec. 14, 1993, Pub.L. 103–183, tit. VII, § 708.

2. The term "on-table" refers to an injury specifically listed on the Vaccine Injury Table in 42 U.S.C. § 300aa–14(a).

3. Encephalopathy is defined in 42 U.S.C. § 300aa–14(3)(A) as "any significant acquired abnormality of, or injury to, or impairment of function of the brain."

4. Originally this case was dismissed by the Chief Special Master on October 14, 1994 for failure to prosecute, following the issuance of multiple orders, starting on December 14, 1990, requesting documents and material required by the Vaccine Act in order for the case to be considered on the merits. On April 4, 1995, petitioners' counsel filed a notice indicating that a paralegal in his office had unilaterally drafted pleadings, forged signatures, and participated in other unethical behavior on this and other pending cases in petitioners' counsel's office. In an order, issued on April 12, 1995, this court remanded the case to the special master for the limited purpose of fact finding regarding whether the case should be reopened as requested by petitioners' attorney of record. On August 25, 1995, the special master issued a report to this court concluding that the prior dismissal be vacated. This court, in an order issued on December 8, 1995, vacated the dismissal of this case pursuant to RCFD 60(b)(1) and (b)(6), and remanded the action to the special master for adjudication on the merits of petitioners' claims.

The Chief Special Master issued a decision, on November 1, 1996, concluding that there was not a preponderance of evidence to demonstrate "Rachael's symptoms began within three days after any of her DPT vaccinations."[5] Having decided that the case did not present an on-table injury, the Chief Special Master then sought expert reports and testimony to elicit answers by the preponderance of evidence as to: (1) whether "Rachael suffered from a pre-existing seizure disorder prior to her third DPT vaccination;" (2) if not, then whether "Rachael's third DPT vaccination caused-in-fact her seizure disorder and/or mental retardation;" or (3) if in the affirmative as to the first question, whether "Rachael's second DPT vaccination caused-in-fact her preexisting seizure disorder or, *in the alternative*, that Rachael's third DPT vaccination caused-in-fact a significant aggravation of her preexisting condition?" The Chief Special Master determined that the petitioners failed to carry the burden of proof in demonstrating an injury entitling compensation under the Vaccine Act.

After careful consideration of the record, the filings submitted by both parties, and the relevant law, the court finds that the Chief Special Master acted in accordance with the law. Thus, the court upholds the judgment of the Chief Special Master denying compensation under the Vaccine Act for the petitioners.

## DISCUSSION

When deciding a motion to review a special master's decision, the judges of the United States Court of Federal Claims shall:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2). The legislative history of the Vaccine Act states that "[t]he conferees have provided for a limited standard for appeal from the [special] master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made." H.R. Conf. Rep. No. 386, 101st Cong., 1st Sess. 512–13, 517, *reprinted in* 1989 U.S.C.C.A.N. 1906, 3115, 3120.

■ Although this court's review of decisions issued by a special master should be conducted within the bounds described above, 42 U.S.C. § 300aa–12(e)(2) dictates that the judges of this court should utilize differing and distinguishable standards of review, depending upon which aspect of the case is under scrutiny. As stated by the United States Court of Appeals for the Federal Circuit:

These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed by us, as by the Claims Court judge, under the arbitrary and capricious standard; legal questions under the "not in accordance with law" standard; and discretionary rulings under the abuse of discretion standard.

*Saunders v. Secretary of Health & Human Services*, 25 F.3d 1031, 1033 (Fed.Cir.1994) (quoting *Munn v. Secretary of Health & Human Services*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992)). *See also Grice v. Secretary of Health & Human Services*, 36 Fed.Cl. 114, 117 (1996); *Rooks v. Secretary of Health & Human Services*, 35 Fed.Cl. 1, 4 (1996); *Cox v. Secretary of Health & Human Services*, 30 Fed.Cl. 136, 142 (1993); *Perreira v. Secretary of Health & Human Services*, 27 Fed. Cl. 29, 32 (1992), *aff'd*, 33 F.3d 1375 (Fed.Cir. 1994). The abuse of discretion standard will rarely come into play except where the special master excludes evidence. *Munn*, 970 F.2d at 870 n. 10.

■ The arbitrary and capricious standard of review is a narrow one. *Carraggio v. Secretary of Health & Human Services*, 38

---

**5.** The petitioners in their motion for review do not raise an objection to the Chief Special Master's determination that Rachael Lampe did not suffer an on table injury.

Fed.Cl. 211, 217 (1997); *Johnston v. Secretary of Health & Human Services*, 22 Cl.Ct. 75, 76 (1990); *see Cucuras v. Secretary of Health & Human Services*, 993 F.2d 1525, 1527 (Fed.Cir.1993); *Bradley v. Secretary of Health & Human Services*, 991 F.2d 1570, 1574 (Fed.Cir.1993); *Estate of Arrowood v. Secretary of Health & Human Services*, 28 Fed.Cl. 453, 457 (1993); *Perreira v. Secretary of Health & Human Services*, 27 Fed. Cl. at 31–32; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The United States Court of Appeals for the Federal Circuit has defined this as a "highly deferential" standard of review. *Burns v. Secretary of Health & Human Services*, 3 F.3d 415, 416 (Fed.Cir.1993) (citing *Hines v. Secretary of Health & Human Services*, 940 F.2d 1518, 1528 (Fed.Cir.1991)). When applying the arbitrary and capricious standard, a reviewing court is not empowered to substitute its own judgment for that of a previous trier of fact. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 416, 91 S.Ct. 814. Instead, when determining whether a decision was arbitrary and capricious, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.; see Hines v. Secretary of Health & Human Services*, 940 F.2d at 1527.

■ Furthermore, "[i]f the special master has considered the relevant evidence in the record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Burns v. Secretary of Health & Human Services*, 3 F.3d at 416; *Hines v. Secretary of Health & Human Services*, 940 F.2d at 1528; *see Lewis v. Secretary of Health & Human Services*, 26 Cl.Ct. 233, 236 (1992); *Murphy v. Secretary of Health & Human Services*, 23 Cl.Ct. 726, 729–30 (1991), *aff'd*, 968 F.2d 1226 (Fed.Cir.1992), *cert. denied*, 506 U.S. 974, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992). Thus, the decision of a special master may be found to be arbitrary and capricious only if the special master:

relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence ... or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Hines v. Secretary of Health & Human Services*, 940 F.2d at 1527 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). This court should accord deference to a special master's decision and the reviewing court "may not substitute its own judgment for that of the special master if the special master has considered all relevant factors, and has made no clear error of judgment." *Lonergan v. Secretary of Health & Human Services*, 27 Fed.Cl. 579, 580 (1993) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 416, 91 S.Ct. 814; *Hyundai Elecs. Indus. Co. v. United States Int'l Trade Comm'n*, 899 F.2d 1204, 1209 (Fed.Cir.1990); *Gamalski v. Secretary of Dept. of Health & Human Services*, 21 Cl.Ct. 450, 451–52 (1990)).

Upon an extensive review of the record in the above-captioned case, including the transcript, the documentary evidence, and the pleadings filed by the parties, combined with the deference granted to a special master who undertakes a thorough and careful adjudication of a case filed pursuant to the Vaccine Act, this court holds that the Chief Special Master properly considered the relevant evidence and did not make a clear error of judgment in the instant action. The record also is absent any evidence that the Chief Special Master made any findings of fact or conclusions of law that were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B). Accordingly, the court adopts the relevant factual findings of the Chief Special Master.

■ The "'not in accordance with law' standard" which applies to legal questions warrants *de novo* review. *Hossack v. Secretary of Dept. of Health & Human Services*, 32 Fed.Cl. 769, 773 (1995) (citing *Neher v. Secretary of Dept. of Health & Human Services*, 984 F.2d 1195, 1198 (Fed.Cir.1993)); *see also Bradley v. Secretary of Dept. of*

*Health & Human Services*, 991 F.2d at 1574 n. 3.

The Vaccine Act provides an alternative to the traditional tort system for individuals who have suffered vaccine-related injuries. *Whitecotton v. Secretary of Health and Human Services*, 81 F.3d 1099, 1102 (Fed.Cir. 1996). The Act permits recovery of compensation for vaccine-related injuries under two distinct legal theories:[6] (1) actual causation and (2) presumed causation under the "Vaccine Injury Table" of 42 U.S.C. § 300aa–14(a). *See id.*

Under the first theory, a petitioner makes a prima facie case of entitlement to compensation upon a showing by a preponderance of the evidence that a vaccine was the cause of the injuries. *See* 42 U.S.C. §§ 300aa–13(a)(1)(A), 300aa–11(c)(1). For the second theory, Congress published the Vaccine Injury Table listing the various injuries associated with different vaccine types and providing associated time periods. *Whitecotton v. Secretary of Health & Human Services*, 81 F.3d at 1102; 42 U.S.C. § 300aa–14. Under the second theory, a petitioner must show that the first "symptom or manifestation" of a table injury occurred within the table's delineated time period following the vaccination. *Whitecotton v. Secretary of Health & Human Services*, 81 F.3d at 1102. Upon such a showing, causation is presumed and the petitioner is considered to have made out a prima facie case of entitlement to compensation. *Id.* Under both the first and second theories, the petitioner's establishment of a prima facie case means that the government must compensate unless it can show by a preponderance of the evidence that a "factor unrelated" to the vaccine was the actual cause of the petitioner's injuries. *Id.;* 42 U.S.C. § 300aa–13(a)(1)(B).

Under the second theory, the Vaccine Act also permits recovery if an individual suffers a significant aggravation of a pre-existing table injury. 42 U.S.C. §§ 300aa–11(c)(1)(C)(i), 300aa–14(a); *Whitecotton v. Secretary of Health & Human Services*, 81 F.3d at 1102. Congress provided for such cases

> in order not to exclude serious cases of illness because of possible minor events in the person's past medical history. This provision does not include compensation for conditions which might legitimately be described as pre-existing (e.g., a child with monthly seizures who, after vaccination, has seizures every three and a half weeks), but is meant to encompass serious deterioration (e.g., a child with monthly seizures who, after vaccination, has seizures on a daily basis).

*Id.* (quoting H.R.Rep. No. 99–908, at 1, *reprinted in* 1986 U.S.C.C.A.N. 6287, 6356). A petitioner must show that the first symptom or manifestation of the significant aggravation of a table injury occurred within the table time period following the vaccination. 42 U.S.C. § 300aa–11(c)(1)(C)(i); *Whitecotton v. Secretary of Health & Human Services*, 81 F.3d at 1103. The Vaccine Act states that "[t]he term 'significant aggravation' means any change for the worse in a preexisting condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health." 42 U.S.C. § 300aa–33(4). The government can rebut a prima facie case by using the "factor

---

6. The Chief Special Master articulated the statutory framework of the avenues of recovery available to the petitioners and quoted 42 U.S.C. §§ 300aa–11(c)(1)(C):

(i) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine referred to in subparagraph (A) or died from the administration of such vaccine, and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition or the death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table, or

(ii)(*l*) sustained, or had significantly aggravated, any illness, disability, injury, or condition not set forth in the Vaccine Injury Table but which was caused by a vaccine referred to in subparagraph (A), or

(II) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table the first symptom or manifestation of the onset or significant aggravation of which did not occur within the time period set forth in the Table but which was caused by a vaccine referred to in subparagraph (A), . . .

unrelated" test of 42 U.S.C. § 300aa–13(a)(1)(B).

In *Whitecotton v. Secretary of Health and Human Services,* 81 F.3d at 1105, the United States Court of Appeals for the Federal Circuit acknowledged that "significant aggravation" is one of the most difficult concepts in the Vaccine Act. The court in *Whitecotton* noted that

> the primary difficulty in adjudicating the significant aggravation claims of children with a pre-existing condition, is that it is very difficult to know at the age when a child is vaccinated what symptoms would have naturally manifested themselves as the child matured and what symptoms might have remained latent absent the vaccination.

*Id.* Attempting to address this problem, the court in *Whitecotton* provided a four-step framework for analyzing significant aggravation claims. *See id.* at 1107.[7] A special master or court must (1) assess the person's condition prior to administration of the vaccine, (2) assess the person's current condition, (3) determine if the person's current condition constitutes a significant aggravation of the prior condition within the meaning of the Vaccine Act, and (4) determine if the first symptom or manifestation of the significant aggravation occurred within the time period prescribed by the Vaccine Table. *Id.*

In the present case, the Chief Special Master properly utilized the *Whitecotton* framework to analyze the petitioners' claim. It is apparent that there was not an on table injury or on table aggravation, as the evidence did not indicate or demonstrate a pinpoint date for any of the seizure activity, specifically, the bicycle-pedaling movements.

Thus, the petitioners did not prove by a preponderance of the evidence that the date of onset of this activity "occurred within three days after any of Rachael's DPT vaccines" as required by the Vaccine Act for an on table aggravation or injury.

Petitioners argument that the Chief Special Master improperly limited the petitioner's "avenues of recovery" under a causation in fact theory is simply without merit in light of the factual determinations of the Chief Special Master that there was not an on table injury. The petitioner quotes *Grant v. Secretary of Health and Human Services,* 956 F.2d 1144, 1148 (Fed.Cir.1992), to suggest that the Chief Special Master did not allow the petitioners to demonstrate "a logical cause and effect showing that the vaccination was the reason for the injury." In application of the statutory framework of the Vaccine Act, the Chief Special Master recognized that this was an actual causation case, and that the petitioners had two approaches to compensation because there was a preexisting condition. *See* 42 U.S.C. §§ 300aa–11(c)(1)(C)(i) & (ii).

A petitioner can qualify for compensation by meeting the requirements of 42 U.S.C. 300aa–13, which reads in relevant part as follows:

**§ 300aa–13. Determination of eligibility and compensation**

**(a) General rule**

(1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole-

(A) that the petitioner has demonstrated by a preponderance of the evi-

---

7. The court in *Whitecotton* specifically rejected an analytical framework developed in *Misasi v. Secretary of Health & Human Services,* 23 Cl.Ct. 322 (1991). According to the *Whitecotton* court, *Misasi* required a court to

> (1) assess the individual's condition prior to administration of the vaccine, i.e., evaluate the nature and extent of the individual's preexisting condition, (2) assess the individual's current condition after administration of the vaccine, (3) predict the individual's condition had the vaccine not been administered, and (4) compare the individual's current condition with the predicted condition had the vaccine

not been administered. Only if the person's current condition is significantly worse than the person's predicted condition had the vaccine not been administered, is the person entitled to compensation . . . .

81 F.3d at 1104 (citing *Misasi,* 23 Cl.Ct. at 324). According to the court in *Whitecotton,* the *Misasi* framework improperly required petitioners to prove that the post-vaccination symptoms would not have occurred without the vaccination, rather than merely proving that the first symptom or manifestation of the aggravation took place within the table's delineated time period. *Id.* at 1106.

dence the matters required in the petition by section 300aa–11(c)(1) of this title, and

> **(B)** that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

The special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.

\* \* \*

**(b) Matters to be considered**

(1) In determining whether to award compensation to a petitioner under the Program, the special master or court shall consider, in addition to all other relevant medical and scientific evidence contained in the record-

> **(A)** any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death, and
>
> **(B)** the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions.

Any such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court. In evaluating the weight to be afforded to any such diagnosis, conclusion, judgment, test result, report, or summary, the special master or court shall consider the entire record and the course of the injury, disability, illness, or condition until the date of the judgment of the special master or court.

The scope of a special master's inquiry in applying the *Whitecotton* framework is "virtually unlimited." *Whitecotton v. Secretary of Health & Human Services*, 81 F.3d at 1108. Congress intended for the special masters to have "very wide discretion with respect to the evidence they would consider and the weight to be assigned that evidence." *Id.* In the instant case, the Chief Special Master held two hearings to resolve the factual and medical issues presented. After listening to the testimony and gauging the credibility of the evidence presented at the first hearing, the Chief Special Master concluded "that the testimonial evidence presented was neither clear enough nor consistent enough to overcome the contemporaneous medical records." He also concluded that "petitioners did not make a prima facie case of a Table injury" and "[t]here is not a preponderance of the evidence that the onset occurred within three days after any of Rachael's DPT vaccines, but neither is there a preponderance of evidence pointing to any one particular date in December or January, 1976."

In the instant case, the opinions offered by the petitioners' and respondent's medical experts were important to the formation of the Chief Special Master's final opinion which rejected the petitioners' claim. The special master in a vaccine case is not simply the arbiter of the experts' opinions; rather, he or she is both the trier of fact and the decider of law. *See* 42 U.S.C. § 300aa–12(d)(3)(A)(i). "Determining the weight and credibility of the evidence is the special province of the trier of fact." *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844, 856, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982); *see Raspberry v. Secretary of Health & Human Services*, 33 Fed.Cl. 420, 423 (1995). Thus, the Chief Special Master was free to accept or reject portions of the expert medical opinions presented to him in light of the entire record. *See Munn v. Secretary of Health & Human Services*, 21 Cl.Ct. 345, 350 (1990), *aff'd*, 970 F.2d 863 (Fed.Cir.1992); *see also Mills v. Secretary of Health & Human Service*, 27 Fed.Cl. 573, 578 (1993). Moreover, the Chief Special Master was not obligated to accept the entirety of an expert's interpretation of an individual's medical history. *See, e.g., Munn v. Secretary of Health & Human Services*, 21 Cl.Ct. at 350.

It is important to remember that "[t]he fact-finder has broad discretion in determining credibility because he saw the witnesses and heard the testimony." *Bradley v. Secretary of Health & Human Services*, 991 F.2d at 1575. It is well-established that wit-

ness credibility is primarily within the purview of the trier of fact, and that a special master's determinations of credibility should be given appropriate deference because he or she had the opportunity to listen to the testimony, ask questions of the witnesses, and observe their demeanor. *Griessenauer v. Dep't of Energy,* 754 F.2d 361, 364 (Fed.Cir. 1985); *Richardson v. Secretary of Health & Human Services,* 23 Cl.Ct. 674, 678 (1991); *see also Burns v. Secretary of Health & Human Services,* 3 F.3d at 417; *Snyder v. Secretary of Health & Human Services,* 36 Fed.Cl. at 465; *Horner v. Secretary of Health & Human Services,* 35 Fed.Cl. 23, 28 (1996). This court should not second-guess the credibility determinations of the Chief Special Master unless they are proven to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. A special master's determinations regarding credibility are "virtually unreviewable." *Bradley v. Secretary of Health & Human Services,* 991 F.2d at 1575 (citing *Hambsch v. Dep't of Treasury,* 796 F.2d 430, 436 (Fed. Cir.1986)); *Snyder v. Secretary of Health & Human Services,* 36 Fed.Cl. at 465; *Walker v. Secretary of Health & Human Services,* 33 Fed.Cl. 97, 100 (1995). The court should not substitute its judgment for the factual findings made by the special master when he has considered all relevant factors, and has made no clear error of judgment. *See Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814.

■ The significance of Rachael's bicycle-pedaling movements was weighed by the Chief Special Master following written notice to the parties for them to produce evidence relevant to the inquiry, in the form of his prior decision, issued on November 1, 1996, in requests for expert reports and testimony, and after extensive review of the record as demonstrated in the Chief Special Master's November 1, 1996 decision and the June 4, 1998 entitlement decision. There is no dispute "Rachael Lampe exhibited bicycle pedaling movements following the second DPT vaccination." In addition, it is significant that the first discussion in the medical records of these movements appears in an entry from the hospital follow up after Rachael's grand mal seizure on January 26, 1976, which

clearly states: "On the day after admission Mrs. Lampe mentioned the fact that Rachael had actually had intermittent brie[f] episodes of rhythmic jerking of the right foot for the past month, and therefore *most likely her current episode did not therefore represent a new acute situation.*" (emphasis added). Consequently, the Chief Special Master wrote in his second opinion that

> the only documentation in the medical records, which the court has found more persuasive than petitioners' witnesses' testimony, of problems following any of Rachael's vaccinations is that she experienced rhythmic jerking movements between her second and third vaccinations and she exhibited a seizure on January 26, 1976. Currently Rachael suffers from a seizure disorder and mental retardation.

The petitioners object to the determination of a preexisting condition in that "Rachael Lampe only began having abnormal neurological symptoms (i.e. pedaling movements) after she began receiving her DPT immunizations." This objection to the determination of a preexisting seizure disorder was the subject of much testimony by the parties, and extensively examined in the medical records by the Chief Special Master. As the decision of the Chief Special Master notes: "given that no convincing evidence was presented otherwise which would refute Dr. Lee's contemporaneous and experience conclusions rendered in her Discharge Summary report, and given the supportive expert testimony, the court finds the bike pedaling movements Rachael experienced between her second and third vaccinations constituted the onset of a seizure disorder which included the January 26, 1976 seizure and subsequent seizures." The Chief Special Master's finding that this was a preexisting condition before the last DPT vaccination, that is a condition existing prior to the grand mal seizure, is not arbitrary or capricious.

■ In addition, the Chief Special Master specifically addressed whether the second vaccination caused in fact Rachael's seizure condition. In his decision, the Chief Special Master indicated the "limited testimony" offered by petitioner's experts regarding the

causal relationship between Rachael's seizure disorder and the second vaccination was "unpersuasive." He also emphasized that the petitioners' expert's analysis, suggesting a link between the second DPT vaccination and the seizure disorder, was "wholly conjecture and without any support in the records." Moreover, the Chief Special Master noted that the petitioners' expert, Dr. Lewis, conceded "her opinion that the 2nd DPT caused-in-fact Rachael's pedaling movements is based *solely* on their temporal association with the inoculation and that Dr. Lewis deemed, based mostly on the tests conducted years later, that there was no other cause or surrounding illness."

Even if the petitioners' evidence established a conclusive temporal relationship between the DPT vaccination and the seizure activity, the Chief Special Master could have found, as he did in the instant case, that the petitioners had failed to meet their burden of proof to demonstrate causation in fact. (Dec. 16) *See McCarren v. Secretary of Health & Human Services*, 40 Fed.Cl. 142, 147 (1997) ("a mere temporal association between the injury and the vaccination is not enough"). However, the determination is also supported by the expert's finding that "there are no specific clinical signs or pathological findings or laboratory tests that can determine whether a neurological injury is related to the DPT," and that "Rachael's seizure disorder, which was first manifested by the jerking motions and included those movements as well as the subsequent seizures, was idiopathic, with etiology unknown." [8] The Chief Special Master concluded by stating that the petitioners had not proven the DPT vaccination caused the movements "within the Table time frame or even within a medically and legally acceptable time frame for finding actual causation." The court, therefore, finds that the Chief Special Master's finding is not arbitrary or capricious.

■ The petitioners also object to the Chief Special Master's determination that the "third DPT vaccination did not cause a significant aggravation of [Rachael's] preexisting seizure condition." The petitioners suggest that the Chief Special Master improperly examined the "current" medical condition of Rachael, when he "cherry-picked" through the medical records to track Rachael's childhood development in order to assess the aggravation claim. In addition, the petitioners suggest the Chief Special Master should have focused on Rachael's present medical condition, decades after the DPT vaccinations, when assessing the impact of the DPT vaccination's alleged aggravation.

Relying upon the only expert he found persuasive on the significant aggravation issue, the Chief Special Master noted "that Rachael did not sustain an encephalopathy," "that the January 26[, 1976] seizure itself did not constitute an encephalopathy," and "that nothing in the medical records suggested that [Rachael] suffered greater disability in her condition, nor substantial deterioration, within the seven days following her third vaccination." Moreover, the Chief Special Master also cited the same expert's conclusion that the "onset of Rachael's deterioration" was between the ages of 3 and 6, a time period significantly after the third vaccination. The Chief Special Master wrote: "Therefore, Dr. Snyder opined, to a reasonable degree of medical certainty that the third vaccination did not aggravate Rachael's preexisting condition but was the evolution and continuation of her preexisting seizure disorder." The Chief Special Master concluded by stating that "Dr. Snyder's testimony convincingly parallels the medical records."

In addition, the Chief Special Master meticulously traced the developmental history of Rachael's childhood before concluding:

Rachael did *not* exhibit a worsening in her preexisting condition, in any medically or legally significant temporal proximity to the third vaccination, which resulted in markedly greater disability, pain, or illness accompanied by substantial deterioration of health. While it is obvious Rachael's seizure activity changed in character from bike pedaling movements to a full blown seizure requiring hospitalization, which

---

8. This analysis would likewise be significant if the court elected to examine the third vaccination independently for causation in fact—an examination the Chief Special Master logically rejected after determining a preexisting seizure condition existed and, thus, the third DPT vacci- nation could not have caused the seizures. Ultimately, the idiopathic nature of Rachael's condition, with an unknown etiology, would render impossible a determination that the DPT vaccinations caused in fact the seizure disorder and the subsequent medical condition of Rachael Lampe.

some might argue demonstrated markedly greater illness, the January 26, 1976 seizure was not accompanied by substantial deterioration of health. Even with the subsequent seizure activity and well after her early seizures, Rachael continued to reach her developmental milestones.... In short, the court finds it unsupported by the medical records that Rachael experienced a substantial deterioration in her health in temporal proximity to the administration of the third vaccination on January 19, 1976.

Moreover, several medical records, as outlined above, persuasively suggest that Rachael experienced only minor developmental delays until approximately 1980–1981, around age 5, when she appeared to exhibit not only a marked worsening of her seizure activity, but also a significant deterioration in her motor, language, social, and intellectual capabilities.... Were the court to view the medical records in the light most favorable to petitioners, the court would only be able, at best, to find there was a worsening in June 1976, when Dr. Fernandez diagnosed Rachael with developmental delay. Even then, such worsening is five months after the third vaccination, and clearly outside any causal relationship which had been accepted by the medical community and reported in the medical literature. Moreover, none of the experts testifying in this case agreed that a worsening manifesting itself *five months* after a DPT vaccination could be causally related to the inoculation.

The petitioners' implication that the Chief Special Master did not adequately evaluate the record is refuted by the consideration and analysis of the evidence demonstrated in his two decisions. In addition, this court finds unconvincing petitioners' argument that Rachael's current medical condition should be considered exclusive of her medical condition in the years immediately following the allegedly aggravating vaccinations. Adoption of such an approach would force the court to ignore the chronological development of events and, thus, ignore the requirements of demonstrating an adequate causation in fact link and a temporal nexus to the

DPT vaccinations and Rachael's current condition mandated by the Vaccine Act and case law. The Chief Special Master's findings are not arbitrary or capricious.

## CONCLUSION

Upon a review of the record in the above-captioned case, including the transcript, the documentary evidence, the pleadings filed by the parties, and the decisions of the Chief Special Master, combined with the deference granted to a special master who undertakes a thorough and careful adjudication of a case filed pursuant to the Vaccine Act, this court holds that the Chief Special Master acted in accordance with the law, properly considered the relevant evidence and did not make a clear error of judgment in the instant action. The record also is absent any evidence that the Chief Special Master made any findings of fact or conclusions of law that were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B). Accordingly, the court affirms the decision of the Chief Special Master denying compensation to the petitioners.

**IT IS SO ORDERED.**